Robert BASKIN Plaintiff–Appellee,

v.

Les SMITH;  et al.  Defendants–
Appellants.

No.  01–1721.

United States Court of Appeals,
Sixth Circuit.

Nov. 8, 2002.

Before DAUGHTREY, MOORE, Circuit Judges, and ECONOMUS, District Judge.*

## OPINION

ECONOMUS, District Judge.

### I. OVERVIEW

Defendants–Appellants, Officer Les Smith, Officer Mike White, the City of Grand Rapids Police Department, and the City of Grand Rapids, appeal the district court's partial denial of their motion for summary judgment on the basis of qualified immunity. On October 27, 1999, Plaintiff–Appellee Robert Baskin commenced this 42 U.S.C. § 1983 action against the officers and the City asserting claims of arrest without probable cause and use of excessive force in violation of the Fourth and Fourteenth Amendments. On May 22, 2001, the district court granted summary judgment in favor of the defendants on Baskin's claims against White and the City, as well as that portion of Baskin's excessive force claim which relied upon his allegation that Smith threw him across his car during his arrest.

However, the district court denied summary judgment on Baskin's claims of illegal arrest against Smith and that portion of Baskin's excessive force claim which relied upon the manner in which he was handcuffed by Smith. The district court concluded that, viewing the facts in a light most favorable to the plaintiff, a reasonable jury could find that Smith had used excessive force in arresting Baskin and that Smith had arrested Baskin without probable cause. Joint Appendix ("J.A.") at 419, 428. This appeal followed with respect to the district court's denial of summary judgment to Smith on the basis of qualified immunity. We agree and affirm.

### II. BACKGROUND

On October 27, 1996, shortly after midnight, Grand Rapids police officers arrested Ursula Parks and Neicha Patton for creating a disturbance at an Amoco service station located in a targeted patrol area for the Grand Rapids Police Department. As is often the case in these matters, the parties give conflicting accounts of the events that followed.

According to Baskin,[1] while he was in the service station browsing through the food section, he observed Smith "handcuff Patton, put her in a choke hold, kick her, strike her with a flashlight three times and slam her head against the door of the police cruiser while trying to place her in the cruiser." J.A. at 426. Baskin admits that he openly criticized Smith's tactics, saying, "Hey, your conduct is unbecoming an officer," and then told him, "I've taken as much as I can stand and you're arresting the wrong woman. She's not the woman who was causing the disturbance and you're beating her as though she was an animal. That is not how you should treat human beings." Id.

When Smith pointed a container of mace at Patton's face, Baskin told Smith, "I know you're not going to mace her now after you've kicked her three times, you're not going to mace her." Id. at 427. Smith allegedly told Baskin to mind his own business because Smith was not going to mace her. Id. Baskin claims that it was another officer that successfully loaded Patton into the cruiser. Id.

According to Baskin, Smith allegedly walked over to Baskin's car and told him in "vulgar, profane words" either to get in his car, or he would be arrested. Id. At this point, Baskin asked Smith if "he would

---

* The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Baskin's recitation of the facts is taken from his testimony at the criminal trial.

please give [Baskin] his badge number and vehicle identification number," because he intended to report Smith's conduct. Id. Baskin claims that as he attempted to get into his car, Smith shoved him and he accidentally locked the car door. *Id.* Smith allegedly told Baskin to "[g]et into the (bleeping) car or you're under arrest." *Id.* Baskin told Smith. "Well I can't get in the car 'cause the doors are locked." Id. Smith responded, "Then you're under arrest" and escorted him to the police cruiser. Id.

According to Baskin, Smith handcuffed him in a manner which caused Baskin great pain—"pinch[ing][his] wrists until they bled from the cuffs." J.A. at 418. Smith allegedly made Baskin wait forty-five minutes to an hour in the handcuffs outside the county jail, and although Baskin complained about the handcuffs to White, and later to officials at the county jail, he received no medical attention. J.A. at 395–99. A jury acquitted Baskin of the disturbing-the-peace charge on October 9, 1997. J.A. at 223.

Smith, on the other hand, contended that when he and White arrived at the Amoco station, a fight between Parks and Patton was in full force. J.A. 84, 87. He further claims that the officers already present on the scene were unable to calm the women or stop the fight. J.A. 29–32. Smith stated that the Amoco, which was located in a high crime area, was hang-out for neighborhood kids, and that at least ten people were watching the struggle between the police officers and the women. J.A. at 117–18.

That evening, White acted as the "cover officer," to insure that no one else became involved in the scene. He stood aside to watch the crowd and to prevent spectators from entering the area. J.A. at 117–18.

Smith assisted the first team of officers in separating the combatants by forcing them apart and backing them away from each other. J.A. 88–89, 107–08. Although separated from Parks, Patton, who was over six feet tall and weighed more than 250 pounds, refused to get into Smith's patrol car. J.A. at 94–96. After repeated attempts to coax Patton into the cruiser, Smith employed a "knee strike," a technique that Grand Rapids officers are trained to use when confronted with persistent resistance. Smith used his knee twice to strike Patton in the leg muscle. However, the "knee strike" did not work. J.A. at 96–97. Smith then threatened to "pepper spray" Patton if she did not cooperate. According to Smith, he ultimately persuaded Patton to get into the police car by promising to retrieve one of her shoes, which she had lost in the scuffle with Parks. J.A. at 97, 114–15.

In the middle of the struggle with Patton, Baskin allegedly approached Smith from behind, "interjected himself into the arrest, criticized the police officers' actions, and demanded their names and badge numbers." Appellants Brief at p. 9. Smith claims that he asked Baskin to back away and stand by his own car, and told Baskin that he would speak with him after he placed Patton in the cruiser. J.A. at 424. Smith contends that Baskin continued to interfere with Patton's arrest, and after three or four loud exchanges with him, Smith warned Baskin that he would be arrested for creating a disturbance if he did not back away and quiet down. J.A. at 425.

After Smith got Patton into his cruiser, Smith claims that Baskin loudly approached him again demanding his name and badge number. Id. According to Smith, Baskin was speaking loudly enough that the spectators in the parking lot could hear him, in an effort to "entice the crowd." Appellant's Br. at p. 10. Consequently, Smith arrested Baskin for disturbing the public peace. J.A. at 102.

## III. ANALYSIS

### A. Jurisdiction

We review the district court's denial of qualified immunity de novo. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir.1999). At the outset, however, we must consider whether we have jurisdiction to hear this interlocutory appeal. A defendant may not appeal a district court's order denying a claim of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir.2002)(quoting *Johnson v. Jones*, 515 U.S. 304, 320, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). To the extent that a district court's denial of a claim of qualified immunity turns on an issue of law, however, the Supreme Court has held that the denial constitutes a final, appealable decision within the meaning of 28 U.S.C. § 1291. *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

■ In this circuit, it is well established that, for appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case. *Sheets*, 287 F.3d at 585. "Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir.1999)(citing *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir.1998)(explaining that "in order for ... an interlocutory appeal based on qualified immunity to lie, the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case")), cert. denied, 530 U.S.

1264, 120 S.Ct. 2724, 147 L.Ed.2d 988 (2000).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is not a defense to liability; where it is applicable, its purpose is to shield the officer from suit altogether, saving him from the burdens of discovery and costs of trial. *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806, 86 L.Ed.2d 411.

■ The Supreme Court has recently clarified that, in order to assess whether the defendants-officials in this case should be cloaked with immunity from suit, we must engage in a two-part, sequential analysis: first, we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right; if we answer the first question in the affirmative, we must then determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

It is crucial, the Supreme Court has noted, that the second inquiry "be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* Thus, "[t]he relevant, dispositive inquiry ... is whether would it be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." In other words, as the Court stated in *Anderson*, "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

We need not, of course, find a case in which "the very action in question has previously been held unlawful," but, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Id.* In evaluating the contours of the right, "we look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996) (internal quotation omitted).

However, even where a "reasonableness" inquiry is largely fact-driven, summary judgment based upon qualified immunity is still appropriate when a plaintiff's version of disputed material facts demonstrates that a hypothetical reasonable officer would not have known that his actions, under the circumstances, were objectively unreasonable. *Scott v. Clay County, Tennessee,* 205 F.3d 867, 877–78 (6th Cir.2000). Conversely, if genuine issues of material fact exist as to an issue on which the question of immunity turns, summary judgment is improper. *Dickerson,* 101 F.3d at 1158 ("Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights.")

**B.  Arrest without Probable Cause**

The test for whether an officer had probable cause to make an arrest is whether, at the instant of the arrest, "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Diamond v.*

*Howd,* 288 F.3d 932, 936 (6th Cir.2002)(quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Painter v. Robertson,* 185 F.3d 557, 569–70 (6th Cir.1999). Moreover, "the existence of probable cause in a section 1983 action presents a jury question, unless there is only one reasonable determination possible." *Klein v. Long,* 275 F.3d 544, 550 (6th Cir.2001).

Baskin was ostensibly arrested for violating Grand Rapids City Ordinance § 9.137(2), which provides, "No person shall ... (2) Create or engage in any disturbance, fight, or quarrel that causes or tends to cause a breach of the peace."

However, as the district court noted, this court has held that "protected speech cannot serve as the basis for a violation of [municipal] ordinances." *Sandul v. Larion,* 119 F.3d 1250, 1256 (6th Cir.1997). This court has held that "the right of an American citizen to criticize public officials and policies is the central meaning of the First Amendment." *McCurdy v. Montgomery County,* 240 F.3d 512, 520 (6th Cir.2001); *see also Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)("the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").

Although First Amendment protection is very expansive, "fighting words" are denied First Amendment protection. *Sandul,* 119 F.3d at 1255 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). *Chaplinsky* defined "fighting words" as, "[T]hose which by their very utterance inflict injury or tend to incite an immediate breach of the peace.... [S]uch utterances are no essential part of any exposition of ideas, and are of such slight social

value ... that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. *Id.* at 572, 62 S.Ct. at 769.

The fighting words exception is very limited because it is inconsistent with the general principle of free speech recognized in our First Amendment jurisprudence. *See Texas v. Johnson*, 491 U.S. 397, 408–09, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989) (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949)) ("[A] principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'"); *Knight Riders v. City of Cincinnati*, 72 F.3d 43, 46 (6th Cir.1995) ("Fighting words is a small class of expressive conduct that is likely to provoke the average person to retaliate, and thereby cause a breach of the peace"). Fighting words are words that are likely to cause an average person to react thus causing a breach of the peace. *Chaplinsky*, 315 U.S. at 574, 62 S.Ct. at 770. They are words which an onlooker would consider a "direct personal insult or an invitation to exchange fisticuffs." *Johnson*, 491 U.S. at 409, 109 S.Ct. at 2542.

Based on the facts, as alleged by Baskin, he was arrested solely for criticizing Smith's conduct and requesting Smith's badge and vehicle identification numbers, or, in other words, for engaging in protected speech. This is true because according to Baskin's recitation of the facts, his words were directed solely at Smith and, therefore, could not incite the crowd at the service station or cause a breach of the peace. Insofar as we must rely on the undisputed facts and the evidence, viewed in a light most favorable to the plaintiff, we find those facts could establish that Smith violated Baskin's constitutional right to be free from arrest without probable cause.

"It is clearly established that arrest without probable cause violates the Fourth Amendment." *Donovan v. Thames*, 105 F.3d 291, 297–98 (6th Cir.1997)(citing *Beck v. Ohio*, 379 U.S. 89, 90–91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)); *see also Adams v. Metiva*, 31 F.3d 375, 388 (6th Cir.1994)("As discussed previously, plaintiff has presented sufficient evidence to create genuine issues in regard to whether defendant arrested plaintiff without probable cause and then used excessive force, which are both objectively unreasonable actions in light of clearly established law.")

Moreover, although this Court did not decide *Sandul* until 1997, it was also clearly established at the time of Baskin's arrest that, with the exception of "fighting words," Baskin's criticism of a public official could not have been prohibited by a city ordinance. *See Houston*, 482 U.S. at 461–62, 107 S.Ct. 2502 (citing cases that struck down municipal ordinances under which speech could be punished that were not limited to "fighting words"). Accordingly, the district court properly denied the defendants' motion for summary judgment insofar as it applied to Baskin's wrongful arrest claim against Smith.

## C. Excessive Force

■ The use of excessive force by law enforcement officials in effectuating an arrest may give rise to a claim under 42 U.S.C. § 1983. *Bass v. Robinson*, 167 F.3d 1041, 1045 (6th Cir.1999)(citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989), the Supreme Court held that claims alleging excessive force brought against law enforcement officials are to be analyzed under the

"objective reasonableness" standard of the Fourth Amendment.[2]

The Court cautioned that the proper application of this reasonableness standard "requires a careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443; *see Patrick v. City of Detroit,* 906 F.2d 1108, 1115 (6th Cir. 1990).

The question is whether the totality of the circumstances justifies a particular sort of seizure, and the question must be answered "without regard to [the officer's] underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. "The 'reasonableness' must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443.

Excessive force claims can be maintained for cuffing an individual's wrists too tightly. *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir.2001)(citing *Martin v. Heideman,* 106 F.3d 1308, 1312–13 (6th Cir.1997)). In *Martin,* the plaintiff claimed that the defendant officer used excessive force by handcuffing him so tightly that his hands were becoming numb. *Martin,* 106 F.3d at 1310. Martin also alleged that he complained that the cuffs were hurting him while being driven to the jail. *Id.*

Following a twenty minute ride to the jail and a fifteen-minute wait in a holding cell, the officer finally loosened the handcuffs. On appeal, we reversed the district court's decision granting the defendant officer a directed verdict on Martin's excessive force claim, stating that "a genuine issue of material fact exist[ed] as to whether [the officer] used excessive force under the circumstances [.]" *Id.* at 1313.

According to Baskin, Smith handcuffed him in a manner which caused Baskin great pain—"pinch[ing][his] wrists [until] they bled from the cuffs." J.A. at 418. Smith allegedly made Baskin wait forty-five minutes to an hour in the handcuffs outside the county jail. J.A. at 396. Although Baskin complained to White in the patrol car, and later to officials at the county jail, about the handcuffs, he received no medical attention. J.A. at 395–99 ("My conversation was with first [White] and I told him that [Smith] was out of control and was behaving like a bigot and that I was not going to plead guilty and that his handcuffs were purposefully intended to do me harm").[3]

Therefore, it is clear that the evidence, as alleged by Baskin, could support recovery on a claim of excessive force and, furthermore, that the law was clearly established as of October, 1996, that the overly tight application of handcuffs was a

---

2. A factor that is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment is the extent of the injury inflicted. This factor is relevant to a claim brought under the Eighth Amendment for cruel and unusual punishment. *See Herring v. Lacy,* No. 95–3535, 1996 WL 109491, at *5 (6th Cir.1996) (unpublished per curiam table decision); *Parrish v. Johnson,* 800 F.2d 600, 604–05 (6th Cir.1986).

3. Baskin did not depose the defendants about the manner in which he was handcuffed by Smith. However, as the district court noted, even if the defendants provided a conflicting account of the events, a genuine issue of material fact would exist as to the excessive force claim.

violation of an arrestee's constitutional right not to have excessive force applied during an arrest.[4] Accordingly, the district court properly denied the defendants' motion for summary judgment insofar as it applied to Baskin's excessive force claim against Smith.[5]

## IV. CONCLUSION

For the foregoing reasons, the opinion of the district court denying summary judgment in favor of the Defendants on the unlawful arrest and excessive force claims against Smith is AFFIRMED.

4. This circuit's unpublished opinion in *Grooms v. Dockter*, No. 95–1261, 1996 WL 26917 (6th Cir.Jan.23, 1996), a case with similar facts to the current case, also supports reversing the district court's decision to dismiss plaintiff's excessive force claim. In *Grooms*, the plaintiff was handcuffed "extremely tightly" before being placed in the police cruiser. *Id.* at *1.

The plaintiff complained to the officers that he was losing circulation in his hands. The plaintiff was in visible pain in the car and was forced to lie on his side to take pressure off his wrists. The officers, for no apparent reason, left the plaintiff in the patrol car for fifteen minutes before leaving for the station, and then left the handcuffs on the plaintiff until immediately before he was placed in a holding cell. Upon removing the cuffs, the officer laughed and said: " 'I guess they were on too tight!' " *Id.*

Based on these facts, we affirmed the district court's denial of defendant's motion for summary judgment on the grounds of qualified immunity, stating that the facts alleged "could support recovery" on a claim of excessive force. *Id.* at *2.

5. To the extent that Smith argues that Baskin adduced insufficient evidence to demonstrate that Smith handcuffed Baskin too tightly, this "sufficiency of the evidence" argument fails under *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238(1995) *See* Part IIIA, *supra.*